[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The defendant Town of Enfield has moved to set aside the verdict entered in this employment action. The plaintiff Arnone had brought a complaint in four counts, alleging disciplinary action in violation of § 31-51m (the "whistle-blower" statute) and § 31-51q (exercise of CT Page 9925 free speech), and intentional and negligent infliction of emotional distress. The court removed the emotional distress claims from the consideration of the jury. The jury entered a verdict mostly in the plaintiff's favor: it found that the defendant[1] Town of Enfield had violated both statutory provisions and found compensatory damages for back pay in the amount of $78,000, "front" pay in the amount of $13,000 and punitive damages in the amount of $36,000. It awarded no damages for emotional distress. It was agreed by the parties that any action on attorney fees would be taken by the court after the verdict.
The defendant town has moved to set aside the verdict for four reasons: that there was insufficient evidence to support an award of punitive damages, that there was insufficient evidence to support the finding of a causal connection between disciplinary action, including termination, and the exercise of protected speech, that principles of collateral estoppel barred the action, and that expert testimony was improperly admitted into evidence.
The jury reasonably could have believed the following facts.[2] The plaintiff Thomas Arnone was hired by the town of Enfield in the mid-1980's and became an Attendant I in the water pollution control division of the Department of Public Works. He was promoted to the position of Attendant II in 1986. His employment history was largely uneventful[3] until the incidents which form the basis of the complaint.
On June 2, 1995, the plaintiff caused a disruption in the chlorination process for a short period of time by shutting off a valve. Arnone believed that he followed the best course of action in the circumstances; the town believed that other courses of action not requiring bypassing the chlorinator were available to Arnone. A meeting was held, and a written warning dated June 9, 1995, was delivered to Arnone on June 14, 1995. The letter was date-stamped June 12, 1995.
Meanwhile, Arnone learned on June 13, 1995, that another employee, at the request of Serra, had changed a reading on the report regarding the density of sludge solids in materials in the system. Apparently the employee crossed out the first readings and a second number was inserted. The first numbers were in the 6-7% range; the inserted readings were about 4%. The reporting of sludge solids was not required for the purpose of determining whether the town was in violation of its permit, but the state did consider the reporting of sludge solids for the more general purpose of evaluating the operation of the water treatment facilities. Arnone believed that the proper reporting procedure, where a mistake might be suspected, was to report the original finding and include as a notation any explanation. Arnone's suspicions were based partly on a quite cursory view of the sheet and to a greater degree on CT Page 9926 conversations with the employee who entered the numbers. The other employee did so at the specific demand of Serra. The actual sheet shows crossed out and initialed numbers; nothing apparently has been erased or otherwise tampered with.
Because he felt that the reporting procedures were improper, Arnone wrote a complaint to the state Department of Environmental Protection. The state agency referred the matter to the federal Environmental Protection Agency, who assigned it to a criminal investigator. The investigator followed up with a meeting with Arnone on approximately July 13, 1995, and sometime shortly afterward the investigator interviewed the employee who had worked on the sheet. No action was taken on the complaint by any agency and the town apparently was not formally notified of any investigation, or at the very least of any result of any investigation.[4]
On July 1, 1995, Arnone was on vacation but was reached at home to respond to an emergency. This was during the July 4th weekend. Arnone refused to report, and was later given a suspension for insubordination. Arnone claimed that custom and practice allowed a reasonably senior employee the ability to decline to report to duty when on vacation, and he believed that in the circumstances the obligation to respond to the emergency rested with the individual property owner.
On October 12, 1995, Arnone and McVicker, a co-worker, were working at the Grape Brook facility. This was a Friday, and they were on the third day of the job. The job involved scraping and painting in a confined underground facility, and they were using respirators. By 2:00 p.m. of the third day there were tired, partly from use of the respirators, and wanted to go back to the plant. They usually returned to the plant at about 3:00 to shower and prepare to go home. As they were getting ready to leave, Serra and Mike Merrill, their immediate supervisor, arrived on some errand. The plaintiff indicated that they were low on paint and wanted to go back to the plaint, and the supervisors acquiesced. Later, after a disciplinary process, he was suspended for two days.[5]
The complaint in this action was served in early 1996. Subsequently, at the end of July, 1996, Arnone and McVicker were working at the Indian Run Pump Station, Arnone was doing the work below and McVicker was watching from above, apparently a standard procedure for safety purposes. At the conclusion of the work, Arnone apparently left the switch for the pumps in the "both" position instead of on "1" or "2". Each pump, then, fired only twice after he left, and the station began to fill with sewage. An alarm system worked, and the system was pumped before sewage escaped from the pumping station by overflowing. Arnone thought that the switch perhaps could have been jostled to the "both" position by the vibrations CT Page 9927 of the system.
A far more serious incident, at least as to consequences, occurred ten days later. On Friday, August 9, 1996, Arnone, McVicker and others were cleaning a pump station at West Shore and they finished that job around noon. The town claims that when they left, neither the pumps nor the alarms were activated, so incoming sewage simply filled up the pump station and flowed into a neighbor's basement. The neighbor's sump pump directed the material into a nearby pond. The neighbor complained, and late on Sunday the problem was addressed by the town.
Arnone, as an Attendant II, was one of the senior people on the scene when the pump station was cleaned. The investigation of the incident was the subject of much evidence, and the two sides expressed entirely different slants. Arnone agreed that he did not see the switches being returned to the "on" position and the alarms activated; rather he heard someone say they were on and he heard the control box's being closed. Although the evidence was not entirely clear, it appears that one of the pumps ran for 0.6 hours of actual operation after it was checked earlier in the day Friday, probably at about 9:00 a.m., and the time the town investigated, early evening on Sunday. The other pump apparently did not run at all. Arnone claimed that because the average working time for each pump on the normal day was about 0.6 hours per day, then the pump was working and therefore "on" at least through Saturday. The town claimed that because there would be some usage between the time that the pump was checked on Friday morning and the time the station was cleaned, and because the pump is used while the cleaning is going on, the 0.6 hours was accounted for before Arnone left on Friday noon. There were some reporting mistakes in the course of the town's investigation. In any event, the investigatory and hearing processes took place and Arnone was terminated.
McVicker was disciplined as a result of several of the incidents and also was terminated about six months after Arnone was terminated. McVicker could not be located for trial.
Arnone presented evidence tending to show that at least some portions of some of the meetings were conducted in a harsh way, and that he was generally subjected to unfriendly treatment after he complained to the state. The town presented evidence[6] tending to show that the process was conducted in an orderly and professional manner, that McVicker was treated similarly, that the people directly ordering the termination were not even employees of the town when the complaint was made, and that the complaint was of no concern in any event.
With the foregoing as a prelude, I turn to the specific arguments of CT Page 9928 the defendant urging that the verdict be set aside. The first claim is that the evidence was insufficient to support the verdict of punitive damages. Section 31-51q allows the imposition of punitive damages if an employer disciplines or discharges an employee because of the employee's exercise of constitutionally protected rights. As stated above, the jury found such, and awarded punitive damages in the amount of $36,000.
In deciding whether to set aside a verdict on the ground of insufficiency of evidence, the court must inquire whether the jury reasonably could have returned its verdict on the evidence presented. The guidelines are perhaps most succinctly stated in Palomba v. Gray,208 Conn. 21, 24 (1988):
 "The supervision which a judge has over the verdict is an essential part of the jury system. . . . [The trial court] should not set aside a verdict where it is apparent that there was some evidence upon which the jury might reasonably reach their conclusion, and should not refuse to set it aside where the manifest injustice of the verdict is so plain and palpable as clearly to denote that some mistake was made by the jury in the application of legal principles, or as to justify the suspicion that they or some of them were influenced by prejudice, corruption or partiality." Burr v. Harty, 75 Conn. 127, 129, 52 A. 724 (1902). The court has a duty to set aside the verdict where the jury's action is so unreasonable as to suggest that it was the product of such improper influences. State v. Avcollie, 178 Conn. 450, 457, 423 A.2d 118
(1979), cert. denied, 444 U.S. 1015, 100 S.Ct. 667, 62 L.Ed.2d 645 (1980), aff'd, 188 Conn. 626, 453 A.2d 418
(1982), cert. denied, 461 U.S. 928, 103 S.Ct. 2088, 77 L.Ed.2d 299 (1983); Roma v. Thames River Specialties Co., 90 Conn. 18, 19-20, 96 A. 169 (1915). A verdict may be set aside even if the evidence was conflicting and there was direct evidence in favor of the party who prevailed with the jury. Roma v. Thames River Specialties Co., supra, 20.
The test is not only whether a scintilla of evidence exists to support the verdict, but also whether the jury could have reasonably reached its conclusion. The decision-making process is of course tempered by the fact that parties have a constitutional right to jury trials, and a court is not empowered to substitute its judgment for that of the jury, unless the jury, in the court's estimation, could not reasonably on the evidence have reached its result. Palomba v. Gray, supra, 25. The theory is that CT Page 9929 if the jury could not have reasonably reached its conclusion on the evidence, then its verdict must have resulted from mistake, bias, prejudice, corruption or some other improper reason.
No specific test for punitive damages is stated in § 31-51q; the common law test therefore may be utilized:
 In order to award punitive or exemplary damages, evidence must reveal a reckless indifference to the rights of others or an intentional and wanton violation of those rights. Collens v. New Canaan Water Co., 155 Conn. 477, 489, 234 A.2d 825 (1967). In fact, the flavor of the basic requirement to justify an award of punitive damages is described in terms of wanton and malicious injury, evil motive and violence. Triangle Sheet Metal Works, Inc. v. Silver, 154 Conn. 116, 128, 222 A.2d 220 (1966).
Venturi v. Savitt, Inc., 191 Conn. 588 (1983)
The court instructed the jury on the issue of punitive damages, without exception on this point. The language used was similar to the law stated above: in order to find punitive damages, the jury was instructed that it had to find proved a reckless indifference to the rights of others or an intentional and wanton violation of those rights that arose from an improper motive. After a thorough review of the evidence, and considering reasonable inferences in favor of upholding the verdict, I cannot conclude that the jury's decision was so palpably unreasonable as to conclude that a mistake of some sort must have been made. There was evidence on which it could be inferred that the decision-makers knew of the complaint to the DEP. "Word" could have reached them. Perhaps more critically, the letter from Arnone's attorney had been received in 1995 and by early 1996 this action had been served. Although none of the direct decision-makers were personally accused, it may be inferred that they were prejudiced against a whistle-blower, perhaps even more so if the complaint were trivial. Viewed in the light most favorable to the plaintiff, the discipline may be seen as harsh and arbitrary. By embarking on this course of action, it is not entirely unreasonable to conclude that the decision-makers were acting from an improper motive and with a reckless indifference to the constitutionally protected rights of the plaintiff I do not hold, then, that the verdict as to punitive damages should be set aside.[7]
The town's second argument is that there was insufficient evidence to support the jury's finding of a causal connection between the disciplinary actions and the exercise of protected rights. Much of the CT Page 9930 prior discussion also relates to this argument. Suffice it to say that I cannot find that the jury's decision, on which they received explicit instruction, was so unreasonable and contrary to the evidence as to suggest mistake or other deviation from a reasoned consideration. Inferences could be drawn as to the decision-makers' partial reliance on Serra for information and their knowledge of this lawsuit, at a minimum, and their overreacting, in the plaintiff's view, to the plaintiff's minimal transgressions. Although the temporal connection between Arnone's complaint and the disciplinary actions is not particularly strong,[8]
especially when the timing considerations make it unlikely that the first imposition of discipline was caused in any way by Arnone's complaint, one must also consider that he was terminated only approximately fifteen months after the complaint was made, and at least three incidents intervened. Similarly, the treatment of McVicker, while certainly similar, was not identical, and again lack of similar treatment is not an element of the cause of action. I do not find that the causal connection is so lacking in the evidence as to justify the setting aside of the verdict.
The town also argues that the prior arbitration action collaterally estops this action from proceeding. The record as to this claim was made early in the proceedings, and need not be repeated here. I have again reviewed the materials, and I again find that Genovese v. Gallo WineMerchants, Inc., 226 Conn. 475 (1993) compels a finding that collateral estoppel does not apply in the circumstances of this case. The defendant argues that neither the legislative history nor the legal history supports the statements in Genovese to the effect that collateral estoppel does not apply. I believe that I am bound by the Supreme Court's language in Genovese, however, and the motion to set aside is denied in regard to the collateral estoppel claim.
Finally, the defendant claims that the court erred in admitting certain expert testimony of William Hogan, an engineer in the municipal facilities section of the Department of Environmental Protection. Over the defendant's objection, I admitted some of the proffered testimony of Mr. Hogan. The testimony which was allowed described some of the practices of the agency in receiving reports of the municipalities and, to a degree, required procedures. I excluded the expression of opinion, because there had been no disclosure of an expert in this regard, but allowed factual evidence as to the practices of the agency. See, e.g.,Opotzner v. Bass, 63 Conn. App. 555, 567-69 (2001).
The motion to set aside the verdict is denied. The plaintiff has submitted a motion for attorneys fees, and both sides have submitted briefs. The defendant has raised issues which, I believe, require the opportunity of a hearing. The attorneys shall consult with civil caseflow CT Page 9931 to schedule a hearing on the issue of attorneys fees.
Beach, J.